IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| MARY ROSE MARTINCIC,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 1:23-CV-00628-BYP<br><br>JUDGE BENITA Y. PEARSON<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Mary Martincic challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On March 24, 2023, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated Mar. 24, 2023). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

PROCEDURAL BACKGROUND

Ms. Martincic filed for DIB on December 15, 2020, alleging a disability onset date of October 3, 2020. (*See* Tr. 79). After her claim was denied initially and on reconsideration, she requested a hearing before an Administrative Law Judge. (Tr. 79-85, 87-94, 119-20). Ms. Martincic (represented by counsel) and a vocational expert (VE) testified before the ALJ on February 4, 2022. (Tr. 36-77).

On March 10, 2022, the ALJ found Ms. Martincic was not disabled. (Tr. 14-35). The Appeals Council denied Ms. Martincic's request for review, making the hearing decision the final

decision of the Commissioner. (Tr. 1-8; *see* 20 C.F.R. §§ 404.955, 404.981). Ms. Martincic timely filed this action on March 23, 2023. (ECF #1).

FACTUAL BACKGROUND

## I.      Personal and Vocational Evidence

Ms. Martincic was 57 years old on her alleged onset date and 59 years old at the administrative hearing. (Tr. 43, 79). She attended four years of college and completed her degree. (Tr. 43). She worked as a security guard from 1996 until October 3, 2020. (Tr. 45-46).

## II.      Administrative Hearing

In the few years before leaving her position as a security guard, Ms. Martincic noticed that by the time she left work, she would be "painfully sore," and it became difficult to get out of her car and to walk. (Tr. 48). When she was working, her ankles would triple in size and only after 12 hours of rest would the swelling abate. (Tr. 50).

She is a chronic asthmatic, has sleep apnea that causes her to feel tired, has painful arthritic joints, is diabetic, and has Crohn's disease and ulcerative colitis. (Tr. 48, 50). She uses two inhalers to control her asthma and uses a CPAP machine when sleeping. (Tr. 50-51). For Crohn's and colitis, she takes a probiotic and watches what she eats. (Tr. 52). The condition worsens when she is stressed. (*Id.*). For arthritis, she takes meloxicam and tramadol. (*Id.*). The medications ease some of her pain but at times cause dizziness. (Tr. 65). Her doctor wants to prescribe Remicade again but insurance coverage remains a question. (Tr. 52). In the meantime, her doctor prescribed Imuran. (*Id.*). Otherwise, Ms. Martincic uses icepacks and muscle rubs and elevates her legs several times a day to reduce swelling. (Tr. 53, 61). She uses a cane when she leaves the house because she

feels slightly unsteady at times, especially when the pain is worse. (Tr. 62). On bad days, she uses the cane at home. (*Id.*).

Ms. Martincic lives with her elderly parents and helps care for them by making their meals and helping with hygienic care. (Tr. 43). If Ms. Martincic needs help caring for her parents, she calls her brothers. (Tr. 53). On a typical day, Ms. Martincic gives her parents their morning medication, prepares meals, and does some household chores. (Tr. 55-56). She can perform household chores and does the grocery shopping but limits herself in terms of how much she does in a day. (Tr. 53-54). For instance, it may take her two or three days to complete the laundry because she has difficulty using the stairs. (Tr. 54). She handles the shopping over the course of two or three days and when she shops, her only other activities for the day revolve around taking care of her parents. (*Id.*). At the grocery store, Ms. Martincic requests the baggers put fewer items into each bag; when she gets home, she carries one bag at a time. (*Id.*). When she does the laundry, she goes to the basement and stays there until she transfers the clothes into the dryer. (Tr. 57). She "might go downstairs a second time" if a second load of laundry is necessary. (*Id.*). Other family members handle yardwork and snow removal. (Tr. 55).

Ms. Martincic used to enjoy riding her bike but cannot lift the bicycle to put it on the car rack. (Tr. 58). She has not ridden her bike in three years. (*Id.*). She used to play guitar but her fingers do not "want to work right." (*Id.*). She likes to go to the park but uses a walking staff to keep balance and remain upright. (*Id.*). Otherwise, she likes to read. (*Id.*). She recently went to an arcade but had to sit down after playing one or two games. (Tr. 59).

The VE testified that a person of Ms. Martincic's age, education, and experience, with the functional limitations described in the ALJ's RFC determination, could perform her past relevant

work as a security guard. (Tr. 67-71). If the person was limited to occasional reaching and handling, the person could not work as a security guard. (Tr. 71). If the person required occasional use of a cane throughout the day, she would need an accommodation and that would not be considered competitive employment. (*Id*.). If the person needed to elevate her legs twice a day for 30 minutes each, she would be precluded from light exertion work. (Tr. 71-72).

### III.    Relevant Medical Evidence

On July 8, 2019, Ms. Martincic met with endocrinologist Dorota Whitmer, M.D., for uncontrolled diabetes mellitus type 2. (Tr. 315). There, Ms. Martincic endorsed symptoms of hyperglycemia, including polyuria, polydipsia, nocturia, and fatigue. (*Id*.). Physical examination was normal, including no edema or foot ulcers and normal sensation to monofilament testing. (Tr. 318). Due to the systemic use of steroids for an upper respiratory infection, Ms. Martincic's HbA1c increased. (Tr. 319). Dr. Whitmer continued metformin and prescribed Trulicity. (Tr. 320).

On October 29, 2019, Ms. Martincic met with rheumatologist Isam Diab, M.D., for a routine follow up for seropositive rheumatoid arthritis and Crohn's disease. (Tr. 376). She reported intermittent joint stiffness in her back for 20 to 30 minutes and in the fingers, generalized muscle aches, shoulder pain, and difficulty sleeping, but denied cardiovascular and gastrointestinal symptoms. (Tr. 376-77). Physical examination revealed restricted cervical rotation on the left side, restricted extension, and point tenderness, pain with motion and palpation of the shoulders, minimal synovitis and tenderness of the right wrist with modest synovial thickening, borderline positive Phalen test of the left hand suggesting carpal tunnel syndrome, and some tenderness to the hands without synovitis or swelling over the proximal interphalangeal (PIP) and MCP joints. (Tr. 379). Dr. Diab also noted decreased external and internal rotation of the hips,

midfoot pain and metatarsal head tenderness, mild thoracic kyphosis, and fewer fibromyalgia tender points. (*Id.*). Dr. Diab ordered lab work and an ultrasound to further evaluate fatty liver issues. (Tr. 376).

Ms. Martincic returned to Dr. Whitmer's office in November 2019 with significantly improved glucose testing. (Tr. 323-28). She reported tolerating the medications without side effects. (Tr. 327). Dr. Whitmer recommended Ms. Martincic follow up in four to six months. (*Id.*).

On December 2, 2019, Ms. Martincic met with pulmonologist Nizar Nader, M.D., for a follow-up concerning her asthma. (Tr. 388-90). There, she denied worsening of her respiratory status, cough or sputum production, wheezing, and chest pain. (Tr. 389). She reported using the CPAP machine helped her feel more alert and less fatigued. (*Id.*). Otherwise, she complained of mild lower extremity edema. (*Id.*). Physical examination was normal except she displayed decreased breath sounds at the base of the lungs and trace lower extremity edema bilaterally. (*Id.*). Dr. Nader noted her bronchial asthma and chronic allergic rhinosinusitis symptoms were well controlled on current medications. (*Id.*). He continued her prescriptions and, for moderate obstructive sleep apnea due to obesity, he encouraged Ms. Martincic to maintain an ideal body weight. (Tr. 390). Dr. Nader made the same findings and provided the same treatment at follow-up visits on March 11, June 16, and September 15, 2020, and February 1, May 4, August 10, and November 23, 2021. (Tr. 382-88, 465-66, 525-26, 528-30, 532-33).

Pulmonary function testing, dated June 16, 2020, revealed normal $FEV_1/FVC\%$ ratio at 80% predicted with normal $FEV_1$ and normal FVC, normal total lung capacity at 90% predicted, and diffusion capacity reduced to 65% predicted, but is normal when corrected for alveolar volume. (Tr. 397). Dr. Nizar opined this was likely due to her obesity. (*Id.*).

5

On December 9, 2019, Ms. Martincic's colonoscopy revealed moderately inflamed mucosa at the terminal ileum and ileocecal valve, sigmoid diverticulosis, nonspecific inflammation of the rectosigmoid colon, and internal hemorrhoids. (Tr. 273). The surgeon determined Ms. Martincic "has symptoms from Crohn's disease in the past. At the present it seems to be under control. Advised to follow GI soft, low fat, low residue diet." (*Id.*).

On January 14, 2020, Ms. Martincic met with Jarrod Eastep, PA-C, to re-establish cardiac care and complained of shortness of breath. (Tr. 295). PA-C Eastep ordered an echocardiogram to evaluate ventricular and valvular function and a CT to evaluate intracoronary calcium burden. (Tr. 297).

On January 22, 2020, Ms. Martincic's CT scan showed no calcium burden in the coronary arteries. (Tr. 300-01).

On January 28, 2020, Ms. Martincic returned to Dr. Diab's office and reported minor stiffness. (Tr. 371). Dr. Diab recorded similar complaints and physical examination findings to the previous visit and refilled her prescription for meloxicam. (Tr. 371-74).

On February 4, 2020, Ms. Martincic's transthoracic echocardiogram showed normal left ventricular systolic function with a 60% estimated ejection fraction and an impaired relaxation pattern of left ventricular diastolic filling. (Tr. 302-04).

On February 25, 2020, Ms. Martincic met with PA-C Eastep to review the results of testing. (Tr. 305). At that time, she reported feeling well "with no focal cardiovascular symptoms." (*Id.*). She was directed to follow up in one year. (Tr. 312).

On April 15, 2020, Ms. Martincic presented for a telehealth visit with Dr. Whitmer. (Tr. 335-40). She reported feeling well without fatigue and denied abdominal pain, polyuria, and

polydipsia. (Tr. 337). Otherwise, she reported a pruritic rash that she felt was related to Trulicity. (Tr. 338). Dr. Whitmer was not certain that the rash was related to Trulicity but switched her medication to glimepiride. (*Id.*).

On April 28, 2020, Ms. Martincic met with Dr. Diab and reported "somewhat active" rheumatoid arthritis despite treatment. (Tr. 367). On physical examination, Dr. Diab noted restricted cervical rotation on the left side, restricted cervical extension and point tenderness, pain with motion and palpation to the shoulders, synovitis at the right and left elbows, moderate synovitis and tenderness of the right wrist with modest synovial thickening, decreased hip rotation, modest synovitis with swelling at tenderness at the ankles, modest synovitis with swelling and pain over the second, third, and fourth MCP joints bilaterally, mild thoracic kyphosis, and less tender points. (Tr. 370). Examination of her hands revealed modest synovitis and tenderness with modest synovial thickening at the second and third MCP joints, mildly decreased flexion of the MCP joints with decreased grip strength, minimal synovitis at the second and third PIP joints with mild tenderness, and mild synovitis with modest tenderness and synovial thickening at the medial wrists. (Tr. 370). Dr. Diab assessed inflammatory polyarthritis, ordered additional lab work, and initiated preauthorization for Remicade infusions. (Tr. 367).

On June 17, 2020, Ms. Martincic received her first infusion of Remicade to treat her rheumatoid arthritis. (Tr. 360). She tolerated the treatment well and, to Dr. Diab, endorsed doing "fair overall" with some stiffness and pain in the index and middle fingers more than other joints, minimal pain in the feet and ankles, and some fatigue. (Tr. 361). She denied shortness of breath and abdominal pain. (*Id.*). Physical examination revealed similar findings to her previous appointment. (Tr. 364).

On July 14, 2020, Ms. Martincic returned to Dr. Diab's office and endorsed continued improvement with Remicade. (Tr. 355). Physical examination revealed similar findings but less pronounced synovitis and tenderness with modest synovial thickening at the second, third, and fourth MCP joints, minimal synovitis over the PIP joints with mild tenderness, and modest crepitus and mildly decreased range of motion in both knees with minimal warmth in the left knee but without pain or tenderness. (Tr. 358). Dr. Diab refilled her prescription for meloxicam and provided another infusion of Remicade. (Tr. 355-56).

On August 15, 2020, Ms. Martincic tripped and fell at work; her head and upper back struck the ground. (Tr. 416). She went to the emergency room for resulting upper back pain and a headache. (*Id.*). On physical examination, Ms. Martincic had mild thoracic midline tenderness. (Tr. 419). Otherwise, she had normal strength and range of motion without swelling. (*Id.*). A thoracic CT scan revealed normal alignment without fracture or focal abnormality. (Tr. 412). There were mild degenerative disc changes without definite canal or compromise or foraminal encroachment, preserved vertebral body endplates, and a nodule on the left kidney for which the interpreting physician suggested nonemergency CT or MRI with renal protocol. (*Id.*). A cervical CT scan showed scattered mild degenerative changes, most prominent at C5-C6 with mild right foraminal encroachment. (Tr. 413). A brain CT was normal. (Tr. 414-15). Ms. Martincic was discharged in stable condition and left the emergency department with a steady gait. (Tr. 424).

On September 1, 2020, Ms. Martincic met with urologist David Turk, M.D., for evaluation of the left kidney lesion. (Tr. 539-41). Dr. Turk ordered an abdominal and pelvic CT scan. (Tr. 541). On September 15, 2020, the CT scan showed a Bosniak F2 renal cyst. (Tr. 542). Ms.

Martincic denied pain and dysuria. (*Id.*). Dr. Turk advised her to return in six months for a renal ultrasound. (Tr. 544).

On September 8, 2020, Ms. Martincic returned to Dr. Diab's office and reported on-and-off fatigue that is worse at the end of the day and intermittent joint pain in the small joints of the upper extremities. (Tr. 350-54). Physical examination was similar to the previous visit. (Tr. 354). Ms. Martincic received another infusion of Remicade. (Tr. 350).

On February 17, 2021, a left foot X-ray showed varus deformity with evidence of considerable narrowing in the joint spaces of the midfoot, narrowing of the tarsal and metatarsal joints, mild narrowing of the first metatarsophalangeal (MTP) joint, all of which are secondary to degenerative osteoarthritis mostly involving the midfoot. (Tr. 496). There was slight soft tissue swelling at the fifth MTP joint and moderate plantar and posterior calcaneal spurs. (*Id.*). The right foot showed similar considerable degenerative changes in the midfoot and a small plantar and larger posterior calcaneal spur. (Tr. 498-99). A lumbar X-ray showed evidence of considerable degenerative changes involving the facets from L4 to S1 with hypertrophic changes and narrowing, grade 1 spondylolisthesis of L4 over L5 secondary to spondylosis and narrowing of the L4-L5 and L5-S1 disc spaces, without evidence of compression deformity. (Tr. 501-02). Pelvic X-ray showed moderate degenerative changes involving the lumbosacral spine with small enthesophytes involving the greater trochanters and mild degenerative changes involving the left sacroiliac joint. (Tr. 503-04). Wrist X-rays revealed mild degenerative osteoarthritis of the interphalangeal joints bilaterally and avascular necrosis of the left lunate bone with slight widening of scapholunate space. (Tr. 506). Cervical X-rays showed mild degenerative changes with degenerative facet arthropathy at the cervicothoracic junction and slight retrolisthesis of C5 over C6. (Tr. 507).

On March 29, 2021, Ms. Martincic returned to Dr. Diab's office and complained of right leg and hip pain and left hand and carpal pain. (Tr. 474). The leg and hip pain radiates down the front of her leg and worsens with walking. (Tr. 475). Otherwise, she described doing reasonably well with minimal stiffness and pain in the small and large joints and some fatigue. (*Id.*). Physical examination revealed the same findings as the previous visit. (Tr. 478). She reported losing her health insurance in November and wanted to get reapproved for Remicade infusions through her new insurance. (Tr. 474). Dr. Diab felt Ms. Martincic's flare-up occurred because she did not receive regular Remicade infusions and determined the infusions were medically necessary to help halt the progression of her inflammatory arthritis and prevent further deformity. (*Id.*).

On April 1, 2021, Ms. Martincic attended a regular check-up with Dr. Ramella, complaining of fatigue and joint pain but denying chest pain, shortness of breath, abdominal pain, and leg pain and swelling. (Tr. 579-80). Physical examination was normal, including normal motor and sensory function, intact reflexes, gait, and coordination, and normal musculoskeletal range of motion, strength, and tone. (Tr. 580).

On April 20, 2021, Ms. Martincic returned to Dr. Turk's office for follow-up. (Tr. 545). A renal ultrasound showed a stable left kidney cyst. (*Id.*). Dr. Turk advised Ms. Martincic to return in one year for a repeat renal ultrasound. (Tr. 547).

On July 1, 2021, Ms. Martincic met with Dr. Diab and reported recurrent stiffness and pain in the small and large joints, more fatigue, and interrupted sleep. (Tr. 570). Physical examination revealed restricted cervical spine rotation on the left side with restricted extension and point tenderness, pain with motion and palpation of the shoulders, modest synovitis and swelling of the posterior right elbow, modest synovitis with tenderness of the right wrist and

modest synovial thickening, modest synovitis and tenderness with modest synovial thickening at the second and third MCP joints, mild decrease in flexion at the MCP joints with decrease in grip strength, minimal synovitis of the second and third PIP joints with mild tenderness, mild synovitis with modest tenderness and synovial thickening at the medial wrists, decreased hip rotation, modest crepitus and mild decrease in range of motion of the bilateral knees, modest synovitis with swelling and warmth with modest tenderness of the ankles and tarsus joints, modest swelling, synovitis, tenderness, and pain over the second, third, and fourth metatarsal joints of the feet, and mild thoracic kyphosis. (Tr. 570-71). Dr. Diab refilled Ms. Martincic's medication and continued to recommend restarting Remicade infusions. (Tr. 569).

Also on July 1, Ms. Martincic saw Dr. Ramella for a follow-up visit. (Tr. 566). There, she complained of intermittent retrosternal chest pain occurring every one to two weeks, usually brought on by exercise. (Tr. 567). She presented with an occasional cough and wheezing, denied recent sleep disturbances, denied recent rheumatoid arthritis flare ups, and reported her joint pain is controlled with treatment. (*Id*.). Dr. Ramella ordered a nuclear stress test, noting Ms. Martincic cannot tolerate the treadmill stress test due to severe osteoarthritis, rheumatoid arthritis, and COPD. (Tr. 566). The stress test was normal with good left ventricular function and no evidence of stress-induced ischemia or myocardial scarring.

Ms. Martincic underwent a bone mineral density (BMD) test that showed a very low BMD for her age and sex. (Tr. 626). Dr. Diab recommended Ms. Martincic take calcium and vitamin D supplements and engage in weight bearing exercise. (*Id*.).

On July 28, and August 13, 2021, Ms. Martincic returned to Dr. Diab's office for Inflectra infusions. (Tr. 560-64, 597-601).

On November 17, 2021, Dr. Diab determined Ms. Martincic should go back to Remicade infusions after Inflectra caused an allergic reaction. (Tr. 606). Physical examination revealed similar findings to her prior visit except she had moderate synovitis, swelling, and tenderness of the MCP joints in her hands, left more than right, and in multiple PIP joints bilaterally, and had limited grip in both hands due to synovitis, swelling, and tenderness. (Tr. 609). He refilled her medication and ordered her to follow-up in two weeks to begin Remicade infusions. (Tr. 606-07).

On December 29, 2021, Ms. Martincic returned to Dr. Ramella's office for a regular check-up visit and reported bilateral knee and hand pain and morning stiffness. (Tr. 612). She denied chest pain, shortness of breath, abdominal pain, and leg swelling. (*Id.*). Physical examination was normal. (Tr. 613). Dr. Ramella refilled her medications and ordered her to return in three months. (Tr. 612).

On January 6, 2022, Ms. Martincic met with Dr. Diab and complained of minimal lower back pain, joint stiffness in the back and fingers, pain in the shoulders, and difficulty sleeping. (Tr. 616-17). She returned on January 25, 2022 for a Remicade infusion. (Tr. 620). Dr. Diab also prescribed Imuran. (*Id.*).

## IV.  Medical Opinions

On January 27, 2021, State agency reviewing physician W. Scott Bolz, M.D., reviewed Ms. Martincic's medical records and determined she can lift and carry 20 pounds occasionally, 10 pounds frequently; stand and/or walk for 6 hours in an 8-hour workday, sit for 6 hours in an 8-hour workday; occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds; and frequently stoop, kneel, crouch, and crawl. (Tr. 82-83). On May 3, 2021, State agency reviewing physician Elizabeth Roseberry, M.D., adopted Dr. Bolz's limitations and determined the

updated medical records warranted additional limitations, including that Ms. Martincic can frequently push and pull with the left upper and lower extremities, frequently balance, frequently perform handling and fingering bilaterally, avoid all exposure to hazards including machinery and heights, and avoid concentrated exposure to extreme temperatures, humidity, vibration, fumes, odors, dusts, gases, and poor ventilation. (Tr. 90-92).

On December 30, 2021, Dr. Ramella completed a medical source statement concerning Ms. Martincic's impairments. (Tr. 574-77). Dr. Ramella treated Ms. Martincic for rheumatoid arthritis and chronic obstructive pulmonary disease (COPD) and identified symptoms including joint pain and swelling in the knees, ankles, and wrist joint, and shortness of breath with minimal exertion, and clinical findings including joint line tenderness and swelling. (Tr. 574). Dr. Ramella prescribed meloxicam for rheumatoid arthritis and Proair for COPD. (*Id.*). As a result of Ms. Martincic's impairments Dr. Ramella opined she can sit for 30 minutes at a time before needing to get up, stand for 10 minutes before needing to sit down, and can sit and stand/walk for less than 2 hours each in an 8-hour workday; must walk around every five minutes for five minutes;[1] needs 30-minute breaks every 2 hours; needs to elevate her legs to chair level for 50% of the workday to relieve pain and swelling; needs a cane for walking and standing due to symptoms of pain and insecurity; can perform handling, fingering, and reaching activities for 50% of the workday; would be off task for 25% or more of the workday because pain interferes with her attention and

---

[1]



(Tr. 575).

concentration; would miss more than 4 days of work a month; is incapable of even "low stress" work due to pain; and must avoid fumes and dust due to COPD. (Tr. 575-77).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work.

14

*Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

### THE ALJ'S DECISION

The ALJ issued an unfavorable decision on March 15, 2022. (Tr. 14-31). At Step One, the ALJ determined Ms. Martincic meets the insured status requirements of the Social Security Act through December 31, 2024 and has not engaged in substantial gainful activity since October 3, 2020, the alleged onset date. (Tr. 19). At Step Two, she determined Ms. Martincic had severe impairments of inflammatory arthritis, osteoarthritis and allied disorders; inflammatory bowel disease, obesity, heart failure, steatohepatitis, diabetes mellitus; and COPD. (Tr. 20). She determined obstructive sleep apnea, hyperlipidemia, hypertension, and hypothyroidism were non-severe impairments. (*Id.*). She also found that fibromyalgia was not a medically determinable impairment. (*Id.*). At Step Three, the ALJ determined Ms. Martincic does not have an impairment or combination of impairments that meets or medically equals a listed impairment. (Tr. 22). The ALJ reviewed Ms. Martincic's medical records, administrative hearing testimony, and medical opinions and concluded she has an RFC capable of light work with additional limitations including:

> Frequently push and pull with the left upper and left lower extremities; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance, stoop, kneel, crouch, and crawl; frequently handle and finger with the bilateral upper extremities; have frequent exposure to extreme cold, extreme heat, humidity, vibrations, fumes, odors, dusts, gases, and poor ventilation; and never have exposure to hazards such as unprotected heights dangerous machinery, or commercial driving.

(Tr. 24). Justifying the RFC, the ALJ stated:

In summary, the record supports limitations, although not to the degree alleged by the claimant. When considering the combined effect of all of her medically determinable impairments, she is limited to light exertion work. Although her diabetes and inflammatory bowel disease are under good control. The claimant is morbidly obese, which contributes to the limitations she experiences due to her musculoskeletal and respiratory impairments. Her obesity and both rheumatoid and osteoarthritis limit her mobility and agility to the degree that she can never climb ladders, ropes, or scaffolds, nor can she be exposed to hazards. She can occasionally climb ramps and stairs, and frequently balance, stoop, kneel, crouch, and crawl; frequently push and pull with the left upper and lower extremities; and is limited to frequent exposure to vibration. The rheumatology records show synovitis and tenderness in the wrist, elbow, and hand joints, in addition to slightly reduced grip strength, which limits the claimant to frequent bilateral handling and fingering. Finally, the claimant's COPD/asthma and mild heart failure limit her to no more than frequent exposure to temperature extremes, humidity, fumes, odors, gases, and poor ventilation.

(Tr. 29-30). At Step Four, the ALJ determined Ms. Martincic could perform past relevant work as a security guard. (Tr. 30).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence,

or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision is supported by substantial evidence, the Court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); accord *Shrader v. Astrue*, No. 11

13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

DISCUSSION

Ms. Martincic brings two RFC-related issues for review. First, she claims the ALJ incorrectly concluded that Dr. Ramella's opinion was not supported by, and was inconsistent with, other evidence in the record. (ECF #6 at PageID 679-80). Next, she argues the ALJ's RFC is not supported by substantial evidence and the ALJ erred when she "failed to account for the combination of Plaintiff's obesity and the acknowledged related impairments related to her numerous musculoskeletal and arthritic diseases," failed to consider fibromyalgia through the sequential evaluation, and failed to acknowledge her need for a cane, all of which supported that Ms. Martincic could not stand and walk for the requisite 6 hours in an 8-hour workday in order to perform her past relevant work. (*Id.* at PageID 684, 686-87). The Commissioner responds that substantial evidence supports the ALJ's RFC assessment. (ECF #8 at PageID 698). I agree with the Commissioner and therefore recommend the District Court **AFFIRM** the Commissioner's decision in full.

A claimant's RFC is defined as the most a claimant can still do despite the physical and mental limitations resulting from her impairments. 20 C.F.R. § 404.1545(a). The ALJ alone is responsible for determining a claimant's RFC. 20 C.F.R. § 404.1546(c). The RFC must be based on all relevant evidence in the record, including medical evidence, medical reports and opinions, the claimant's testimony, and statements the claimant made to medical providers. 20 C.F.R.

18

§ 404.1545(a); *see also Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, *2 (N.D. Ohio Mar. 2, 2010).

In determining the persuasiveness of a medical opinion, the ALJ considers five factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(c)(1)-(5). The ALJ must explain how she considered the factors of supportability and consistency, and "may, but [is] not required to" explain the remaining factors of relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two opinions are "equally" persuasive. *See* 20 C.F.R. § 404.1520c(b)(2)-(3). I look to the whole document when reviewing the ALJ's decision. *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014). The ALJ must make the reasons for the supportability and consistency analysis sufficiently clear for subsequent review to determine whether substantial evidence supports the claimant's disability determination. *Id.* "So long as the ALJ's decision adequately explains and justifies its determination as a whole, it satisfies the necessary requirements to survive this court's review." *Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 440 (6th Cir. 2012).

The ALJ evaluated Dr. Ramella's opinion as follows:

On December 10, 2021, Aman Ramella, M.D., completed a form entitled "Physical Medical Source Statement." Dr. Ramella reported that he had been seeing the claimant every three months for three years for treatment of rheumatoid arthritis and COPD. He said that she experiences joint pain and swelling in the knees, ankles, and wrist, as well as shortness of breath on minimal exertion. As for her physical abilities, Dr. Ramella opined that the claimant can sit for up to 30 minutes at one time and stand for up to 10 minutes at one time but can do a combination of those activities no more than two hours in an eight-hour workday. He further opined that the claimant needs to include periods of walking around during an eight-hour workday and estimated that every five minutes she must walk for about five minutes and said

19

that the claimant requires unscheduled breaks every two hours lasting 30 minutes, and should elevate her legs. He said that she could lift 10 pounds rarely and less than 10 pounds frequently, and has limitation to reaching, handling, and fingering no more than 50% of the time. He opined that she requires the use of an ambulation aid. Finally, Dr. Ramella opined that the claimant would be likely to be off-task during the workday 25% or more and incapable of even "low stress" work.

Dr. Ramella's opinion is not persuasive for several reasons. First of all, while his treatment notes and those of Dr. Diab adequately document the findings of joint pain and swelling, as well as occasional shortness of breath, there is no documentation of difficulty walking or standing, use of an ambulation aid, or medical advice to elevate her legs. In fact, treatment records show that she has no more than minimal edema. Finally, Dr. Ramella's notes do not document the claimant having any difficulty maintaining attention or concentration, difficulty performing activities of daily living, nor any sign that she has difficulty managing stress. He is not trained as a mental health specialist and therefore is not qualified to draw any conclusion about the claimant's ability to manage stress, particularly in the absence of any observations of such in his own or other treating professionals' clinical notes.

(Tr. 29).

Ms. Martincic does not argue the ALJ did not evaluate the supportability and consistency of Dr. Ramella's medical opinion, and the ALJ's decision clearly addresses those factors. Instead, she claims the ALJ's conclusions are incorrect and that Dr. Ramella and Dr. Diab's treatment records both supported and were consistent with Dr. Ramella's opinion. (ECF #6 at PageID 680). Ms. Martincic supports her argument with a plethora of evidence, all of which the ALJ acknowledged and evaluated in her decision. (*Id.* at PageID 680-81). Ms. Martincic's alleged error amounts to a disagreement with the conclusions the ALJ drew from the medical evidence and does nothing to undermine the substantial evidence the ALJ relied on in support of her decision. While Ms. Martincic has joint pain, swelling, and occasional shortness of breath, the ALJ accurately notes there is a dearth of evidence suggesting further limitations.

20

Even if the medical findings and reports she cites amount to substantial evidence supporting her position, a district court may not overturn the ALJ's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. Because substantial evidence supports the ALJ's evaluation of Dr. Ramella's medical opinion and Ms. Martincic has not identified any error in that evaluation, I recommend the District Court decline to remand on this basis.

Next, Ms. Martincic argues the ALJ "failed to account for the combination of Plaintiff's obesity and the acknowledged impairments related to numerous musculoskeletal and arthritic diseases." (ECF #6 at PageID 684). Contrary to this argument, the ALJ specifically addressed how Ms. Martincic's morbid obesity, in combination with rheumatoid and osteoarthritis, limited her mobility and agility and provided restrictions in the RFC to address those limitations. (*See* Tr. 29-30).

Ms. Martincic also takes issue with the ALJ's findings related to fibromyalgia, claiming "regardless of whether fibromyalgia was a severe impairment, the ALJ failed to continue through the [s]equential [e]valuation and consider additional impairments when forming the RFC." (ECF #6 at PageID 686). Ms. Martincic is correct that an ALJ must consider the limitations imposed by all her impairments, severe and non-severe, when assessing her RFC. *See* 20 C.F.R. § 404.1545(A)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' as explained in §§ 404.1520(c), 404.1521, and 404.1523, when we assess your residual functional capacity."). But she is incorrect that the ALJ had to consider fibromyalgia in assessing her RFC because the ALJ determined fibromyalgia *was not a medically determinable impairment*. As such, the ALJ had no

21

obligation to consider it. *Rouse v. Comm'r of Soc. Sec.*, No. 2:16-CV-0223, 2017 WL 163384, at *4 (S.D. Ohio Jan. 17, 2017), report and recommendation adopted, No. 2:16-CV-223, 2017 WL 1102684 (S.D. Ohio Mar. 24, 2017) ("a claimed condition which is not 'medically determinable' need not be considered at all.").

Finally, Ms. Martincic believes the ALJ erred by failing to include Ms. Martincic's need for a cane in the RFC. (ECF #6 at PageID 687). She argues the ALJ should have done so because Dr. Ramella opined she needs a cane for pain and security, and she testified during the administrative hearing that she needed it. (*Id.*). But the ALJ reasonably discounted Dr. Ramella's opinion and Ms. Martincic's testimony by noting that, on examination, Ms. Martincic consistently walked with a normal gait and no medical record documented her use of a cane. (Tr. 28) ("Her statements that she uses a cane are wholly unsupported in the records, which do not mention use of any ambulation aid, and also contain physical examination findings of normal gait."). This evidence substantially supports the ALJ's conclusion.

Because the ALJ's RFC is supported by substantial evidence and Ms. Martincic has not identified an error in the ALJ's assessment, I recommend the District Court decline remand on this basis.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying disability insurance benefits.

Dated: February 2, 2024

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).